Filed 3/4/16  IMT Capital 11525 Blucher v. NMS Properties CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| IMT CAPITAL 11525 BLUCHER, | B252101 c/w B255823 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC473835) |
| v. | |
| NMS PROPERTIES, et al., | |
| Defendants and Appellants. | |
| _____ | |
| AND RELATED CROSS-ACTION | |

APPEAL from a judgment and postjudgment order of the Superior Court of Los Angeles County, Michael Johnson, Judge.  Affirmed.

Levinson Arshonsky & Kurtz, Richard I. Arshonsky and Jason J. Jarvis; Lewis Roca Rothgerber Christie and Robert G. Schaffer for Plaintiff, Cross-defendants and Respondents.

Brentwood Legal Services and Steven Zelig; Pircher, Nichols & Meeks and James L. Goldman; Miller Barondess and James Goldman for Defendants, Cross-complainants and Appellants.

Defendants, cross-complainants and appellants Northgate Apartments, LLC (Northgate) and NMS Properties, Inc. (NMS) (sometimes collectively referred to as Northgate) appeal (1) a judgment granting declaratory relief to plaintiff, cross-defendant and respondent IMT Capital 11525 Blucher, LLC and cross-defendant and respondent Investors Management Trust Real Estate Group, Inc. d/b/a IMT Residential (collectively, IMT) following a bench trial; and (2) a postjudgment order awarding IMT $1,185,783 in attorney fees.

The essential issues presented are (1) whether the trial court misconstrued the language of a written grant of easement by concluding that Northgate's easement over IMT's property is not exclusive to Northgate, and (2) whether the trial court abused its discretion in the amount of attorney fees it awarded to IMT as the prevailing party.

We conclude the trial court properly construed the grant of easement and acted within its discretion with respect to the amount of attorney fees awarded to IMT. Therefore, both the judgment and the postjudgment order are affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.[1]

IMT owns real property located at 11541 Blucher Avenue in Granada Hills, where it operates a 52-unit townhouse development (the IMT Property). To the north, Northgate owns real property located at 11611 Blucher Avenue, where it operates an 80-unit apartment complex (the Northgate Property). NMS manages the Northgate Property. The IMT and Northgate properties share a common boundary: the northern boundary of the IMT Property and the southern boundary of the Northgate Property. Both properties are on Blucher Avenue, which curves in an arc from the northeastern corner of the Northgate Property to the southwestern corner of the IMT Property.

---

[1] Because appellants do not challenge the trial court's basic factual findings, we summarize the factual background largely from the trial court's statement of decision.

2

Both properties formerly were owned by William Bromiley. He acquired the Northgate Property in 1981 and the IMT Property in 1984. He developed the Northgate Property by constructing the 80 apartment units which are now there.

To provide primary access to the Northgate property, Bromley constructed a driveway from the northeast corner of the Northgate Property on Blucher Avenue to the central area of the Northgate development. Bromiley also utilized a secondary access road from the southwestern corner of the Northgate Property, traveling south along the western edge of the IMT Property to Blucher Avenue. The northeastern driveway served as the principal access to the Northgate Property, and the southwestern road served as a secondary access that was rarely used. The IMT Property was undeveloped during this time.

In 1985, Bromiley sold the IMT Property to Alan Keranen. One year before doing so, Bromiley recorded a "Notice of Consent to Use of Land," stating the IMT Property granted the Northgate Property a non-exclusive license to use the road along the IMT property's western boundary for "vehicular ingress to and egress from" the Northgate Property.

In 1985, in connection with the sale of the IMT Property to Keranen, Bromiley executed the written grant of easement which is the focus of this controversy. The grant of easement gave the Northgate Property (referred to as the Dominant Property) a "perpetual exclusive easement" for a "right of way for vehicular and pedestrian access" along the southwestern road, described as the westerly 35 feet of the IMT Property.

In 1992, Bromiley sold the Northgate Property to Neil Shekhter and his wife, who later transferred title to the Northgate entities. Northgate has continually owned the Northgate Property through the present time. During the period of ownership by Northgate, the principal access to the Northgate Property continued to be via the northeastern driveway, and the southwestern road served as a secondary access that was rarely used. To enhance security, Northgate installed a gate at the north entrance of the road, which was often padlocked. Northgate's resident manager described the

3

southwestern road as rarely used during this period, with broken pavement and overgrown tree roots.

Between 1985 and 2010 the IMT Property was owned by several entities. One of the owners began construction of the townhouse development which is now there. In 2007, the developer filed a tentative tract map, which showed a six-building development using the southwestern road as the sole access to the IMT Property. This was included in a notice of development that was served on surrounding property owners, including Northgate. Similar diagrams, also showing use of the southwestern road as the sole access to the IMT Property, were filed with the Los Angeles Fire Department.

Construction of the townhouse development on the IMT Property began and continued to the point at which the exterior portions of all townhouse buildings were completed. As part of the construction, the pavement along the southwestern road was removed and some utility lines were buried under the easement area. The southwestern road and easement area were intended to be the sole access to the new townhouse development on the IMT Property.

The owner who was developing the IMT Property ran into financial difficulties, and the construction came to a halt and remained idle for an extended period of time. IMT acquired the property in a foreclosure sale and IMT's title was recorded on September 30, 2010.

Before closing escrow, IMT received a preliminary title report which described Northgate's easement along the southwestern road. IMT reviewed the easement, consulted with counsel, and concluded the easement did not restrict its rights to improve the IMT Property or the area on and around the southwestern road. IMT therefore decided to proceed with the development plans that had been commenced by the previous owner.

In September 2010, before close of escrow, IMT's regional manager Charles Rodriguez advised Northgate's resident manager, Anne Alba, that IMT planned to develop a gated community on the IMT Property. Alba told Rodriguez that Northgate

4

planned to install new gates on the northeastern driveway and the southwestern road, and it was waiting until IMT finished construction so that the gate systems would match.

After IMT's escrow closed, Jeremy Byk and Erik Grimm of IMT met with Neil Shekhter and James Anderson of Northgate on November 5, 2010. The IMT representatives initiated the meeting to introduce themselves to Northgate and to discuss IMT's ongoing interest in acquiring property in the San Fernando Valley. The four met on the Northgate Property, walked down to the IMT Property along the unpaved southwestern road, and walked through several of the townhouses that were under construction. During their time together, Byk told Shekhter that IMT planned to use the southwestern road for access to the IMT Property and would repave and improve the road and install access gates. Byk said that these plans would permit Northgate residents to pass through the gates and have access to the southwestern road.

IMT proceeded with construction during 2010 and 2011, following the plans developed by the prior owner. Consistent with the original plans, IMT buried all utilities under the southwestern road, installed catch basins and storm drains along the road, paved the road, finished a retaining wall on the western side of the road, and made a number of improvements on the eastern side of the road. All of this work was obvious, and Northgate's resident manager, Alba, discussed the work in emails with her supervisors.

Some of the final work on the southwestern road included the installation of electronic access gates at the north and south ends of the road. The gates were operated by a keypad, and IMT planned to give Northgate the code so that its residents could open the gates and use the southwestern road for access to and from the Northgate Property. The south gate on Blucher Avenue would be set up for dual access by IMT and Northgate residents, while the north gate would be restricted to Northgate residents only.

Residents were scheduled to begin moving into the townhouses on the IMT Property in early November 2011. Before the gates along the southwestern road became operational, there was a discussion between Northgate and IMT representatives on

5

October 25, 2011. Shekhter asked Northgate's resident manager Alba to contact IMT about the access gates. IMT's representative Byk assured Alba that Northgate residents would have access to the southwestern road and would receive codes for the gates. IMT's representative Grimm also assured Jim Anderson at Northgate that access codes would be provided to Northgate residents. At Northgate, there was disagreement as to whether it would be better to receive access codes or remote control devices to operate IMT's gates.

On October 26, 2011, Shekhter called IMT and complained about IMT's improvements within the easement area. The following day, October 27, 2011, Northgate's attorneys sent a demand letter to IMT. The letter quoted the language of the easement grant, asserted that Northgate had *exclusive* use of the easement area, and demanded that IMT "immediately cease your use of my client's exclusive easement, remove all of your materials located on the easement (including, but not limited to the gate, utilities, and permanent driveway), and restore the easement area back to its original condition within thirty (30) days of the date of this letter." Northgate's letter also threatened legal action if IMT failed to comply.

The October 26 telephone call from Shekhter and the October 27 demand letter were the first time that Northgate complained about IMT's improvement or development of the easement area. The construction plans by IMT and its predecessors were available; representatives of the two companies had discussed IMT's plans to improve the southwestern road and easement area; the scope of the work and layout of the construction were obvious; and Northgate's resident manager had observed the construction and reported its progress to her superiors. However, Northgate registered no objection to IMT's improvements until after they were completed and IMT residents were scheduled to move into the project and use the southwestern road.

John Tesoriero, an officer of IMT, called Neil Shekhter in response to the October 27 demand letter. During two telephone conversations in November 2011, Tesoriero assured Shekhter that Northgate residents would have access to the southwestern road

6

and would receive codes for the gates.  Shekhter told Tesoriero that there was nothing to talk about, and he insisted that IMT cease all use of the easement.

On November 21, 2011, IMT filed its complaint in this action, seeking declaratory and injunctive relief.  During the pendency of this action, residents have moved into the IMT Property and have been using the southwestern road for ingress and egress.  The gates have been activated and IMT has continually offered to provide Northgate with access codes.  When Northgate expressed a preference for remote control devices instead of codes, IMT offered remotes.  Although Northgate expressed no interest in receiving either access codes or remotes, IMT delivered them to Northgate shortly before trial.  Northgate did not distribute either the remotes or the access codes to its residents.  Northgate residents have not used the southwestern road, and they have continued to enter and exit the Northgate Property via the northeastern driveway.

Northgate obtained a survey of the easement area.  The survey showed that IMT's improvements encroach upon the easement area in the following respects:  the retaining wall on the western side of the road extends 1½ feet into the easement; the elevated lights along the retaining wall extend 9 inches into the easement; the north and south gates, curbs, keypads and bollards extend 6 feet into the easement; the curbs and landscaping on the eastern side of the road extend 6 feet into the easement; the electrical transformer at Building 3 extends 2½ feet into the easement; the block wall at Building 3 extends 3 to 4 inches into the easement; the elevated "pop-outs" on Building 2 extend 9 to 10 inches into the easement; the sidewalk, guard rail and retaining wall at Building 1 extend 6 feet into the easement; the backflow valve, curbs and bollards at the south end of the road extend 6 feet into the easement; and the United States Postal Service mailboxes, walkway and bollards at the south end of the road extend 6½ feet into the easement.  The survey shows that the southwestern road is 28 feet wide in all areas, except that it is 20 feet wide within the openings of the north and south gates, and 23 feet wide in the lower roadway where the backflow valve is located.

The Los Angeles Fire Department and Building and Safety Department have both approved the townhouse development and southwestern road as constructed by IMT. Since completion of the IMT project, the Fire Department has responded to several calls to the IMT and Northgate properties without incident or difficulty. The IMT access gates each have a "Knox box" which permits fire trucks and equipment to enter the gates and travel along the full extent of the southwestern road.

2. *Proceedings*.

a. *Pleadings*.

On November 23, 2011, IMT filed a first amended complaint asserting claims against Northgate and as well as management company NMS for declaratory relief, quiet title and injunctive relief. IMT asserted that it and its residents and invitees were entitled to use the easement area for ingress and egress, and that its improvements to the easement area do not violate the terms of the easement.

On March 5, 2012, Northgate and NMS filed a first amended cross-complaint, alleging, inter alia, causes of action for quiet title, declaratory relief, trespass and negligence.[2]

b. *Bench trial and statement of decision*.

Following a bench trial, the trial court issued an extensive statement of decision which provided in substance:

The trial court rejected Northgate's argument that the easement was exclusive in nature, finding this interpretation was not supported by the language of the instrument or the secondary evidence presented at trial. The trial court concluded the easement permits the IMT Property to make any use of the easement area that does not unreasonably interfere with the Northgate Property's rights.

---

[2]    Northgate also pled causes of action for nuisance, and intentional and negligent interference with contract and business advantage. However, IMT successfully moved for summary adjudication on those causes of action.

8

(1) *Trial court's determination the easement grant was ambiguous with respect to whether Northgate has an exclusive easement over the easement area.*

In approaching the issue, the trial court recognized, "Like a contract, if the language of an easement is ambiguous, extrinsic evidence may be used as an aid to interpretation unless such evidence imparts a meaning to which the instrument creating the easement is not reasonably susceptible. *Buehler v. Oregon-Washington Plywood* (1976) 17 Cal.3d 520, 526 [(*Buehler*)]; *Wolf v. Superior Ct.* (2004) 114 Cal.App.4th 1343, 1350-1351."

The trial court found the grant of easement was ambiguous on its face and was internally inconsistent. The instrument purported to grant Northgate "a perpetual *exclusive* easement" (emphasis added) for vehicular and pedestrian access, including ingress, egress, and regress, and for grading, roadway, utilities, drainage, landscaping and incidental purposes, and it also provided that IMT, the grantor, "covenants and agrees that no buildings, structures, or improvements of any kind shall be placed, erected or maintained on any part or portion thereof."

However, these provisions of the instrument were in conflict with other portions thereof. While the instrument purported to grant the Northgate Property an "exclusive" easement, it also stated that the IMT Property "shall not make any use of the Easement Area which interferes with or is incompatible with the full and free exercise of the Easement rights and rights of way of Grantee created hereby," thus explicitly contemplating further use of the easement by the IMT Property. Also, while the instrument purported to prohibit the IMT Property from constructing any improvements in the easement area, the instrument also required the parties to bear their respective costs in improving the easement area and to pay the expense of maintaining their own improvements.

9

(2) *Trial court resolved the ambiguity in the instrument to conclude the easement is nonexclusive and that IMT may use and improve the easement area as long as it does not unreasonably interfere with Northgate's use and enjoyment of the easement.*

The trial court reasoned: "Northgate places great emphasis on the grant of a 'perpetual exclusive easement' to the Northgate Property and argues that this excludes all rights of the IMT Property. But when the language of our easement is read as a whole, this term merely excludes other surrounding property owners from use of the southwestern road. Without this designation of an 'exclusive' easement, the IMT Property would have the inherent right to grant passage along the southwestern road to any other adjacent property owner. . . . By designating the easement as 'exclusive' to the Northgate Property, the IMT Property was prohibited from permitting other landowners to use the southwestern road for passage to Blucher Avenue."

Looking beyond the language of the instrument, the trial court also considered evidence presented at trial with respect to the conduct of the parties in the years since the easement's creation in 1985. The trial court found the "testimony of Northgate's resident property manager Anne Alba was especially persuasive. She lived at the Northgate Property from 1989 to the time of trial, under the ownership of both Bromiley and Shekhter. Alba said that during this entire period the southwestern road was rarely used. It was paved but had cracks and protruding roots that made passage difficult. A gate was installed at the north end of the road, but it was not automated or self-opening and it was frequently padlocked to enhance security at the Northgate Property. This conduct is totally at odds with the arguments that Northgate made at trial." The trial court concluded "[t]he conduct of the parties shows very clearly that the easement was intended to provide the Northgate Property with a limited, secondary access road through the IMT Property. It was never intended to provide the broad and exclusive rights that Northgate has claimed."

10

The trial court also focused on the intent of Bromiley, the grantor of the easement, stating: "Bromiley testified that he created the easement to provide a secondary access road for the Northgate Property -- to permit access by emergency vehicles and to provide a second way in and out for tenants and commercial vehicles servicing the Northgate Property. This is entirely consistent with the language of the easement and with the subsequent conduct of the parties."

The trial court also noted that "Bromiley said at one point during his testimony that he used the term 'exclusive' to ensure that he alone would have the right to use the easement area. This testimony has no value, because it is inconsistent with the express language of the easement. . . . . [¶] Moreover, this aspect of Bromiley's testimony was not credible. On his first day of testimony Bromiley was called by IMT and testified (consistent with the language of the easement) that he wanted the easement to provide a secondary access road for the Northgate Property. After he was excused, Bromiley was recalled by Northgate on the following day and gave his interpretation of the term 'exclusive.' Bromiley's second day of testimony was largely prompted by leading questions, it was different from his deposition testimony, and it appears that he was trying to help out Neil Shekhter -- his business partner on another real estate venture. Whatever the reason, this aspect of Bromiley's testimony was entirely unbelievable."

(3) *Trial court found IMT's improvements did not unreasonably interfere with Northgate's easement rights.*

The trial court found no unreasonable interference by IMT with Northgate's easement rights. "Northgate contends that IMT's improvements have interfered with its right to ingress and egress under the easement, but the evidence has proven the opposite. IMT's construction has improved the southwestern road and enhanced its use by everyone -- including residents of the Northgate Property. Before IMT's construction, the southwestern road was so cracked and overgrown with tree roots that passage was difficult. Now it is smoothly paved and lighted, a retaining wall along the western edge provides stability, the road has drainage and landscaping, and it has been approved by the

11

Fire Department . . . . It is much more functional than it was before IMT acquired the property. [¶] Northgate has complained that areas of the improved road are narrower than the 35 feet specified in the easement. While this is true, it does not interfere with the overall purpose and function of the easement as a secondary access road for the Northgate Property. The southwestern road is 28 feet wide in all but a few places, and this complies with Fire Department requirements and permits all manner of vehicles to pass up and down the road."

Traffic "from the Northgate Property can easily pass up and down the southwestern road, and the reduction in width does not interfere with its use. The operation and use of the southwestern road are enhanced by the retaining wall and elevated lights along [the] western side of the road, the curbs and landscaping on the eastern side of the road, and the paving, catch basins and storm drains along the entire road. The unrelated encroachments within the 35 foot easement area (the electrical transformer and block wall at Building 3, the elevated 'pop-outs' on Building 2, the sidewalk, guard rail and retaining wall at Building l, and the backflow valve and mailboxes at the southern end of the road) are entirely minor and insubstantial, and they do not interfere with Northgate's rights."

As for Northgate's argument that IMT's security gates interfere with its use of the easement, the trial court found "no evidence to support this argument. IMT's gates are a reasonable improvement which enhance security for both properties and prevent IMT residents from entering the Northgate Property. [Citations.] [¶] IMT offered to provide Northgate with access codes for the security gates all along, but Northgate had no interest in them. IMT has now provided Northgate with both access codes and remote control devices. The gates can be opened by residents of the Northgate Property, both by vehicles and pedestrians. The southwestern road is much more accessible now than it was when Northgate closed off the road with a padlocked gate."

Northgate has plans to add 28 apartments in two new buildings on the Northgate Property, and it contended that IMT's improvements will prevent use of the easement by

12

the vehicles and equipment necessary for construction of these additional residential units.[3] The trial court rejected this argument, stating: "the southwestern road is fully accessible and useable for all of these purposes. All manner of construction trucks, trailers and equipment can easily travel up and down the road and through the gates installed by IMT. Northgate's witnesses testified that the greatest width of any construction vehicle or equipment would be 14 feet, which can easily pass through all segments of the road (23 to 28 feet wide) and security gates (20 feet wide). [¶] Northgate's principal argument has been that IMT's improvements will prevent its use of the easement [to park] construction vehicles and trailers and for storage of construction materials (referred to as construction 'staging'). But this use is not permitted by the terms of the easement. The express language of the easement says nothing about parking or storage on the easement area. It simply guarantees passage through the IMT Property."

Further, "[p]arking and storage on the southwestern road are also prohibited by the Los Angeles Fire Department. Captain Luke Milick testified that the southwestern road is a fire road, and the Fire Department would not permit the road to be blocked with construction equipment, employee vehicles or construction supplies. Blocking the road in this manner would be a Fire Code violation that cannot be waived."

The trial court also addressed Northgate's arguments that IMT's improvements would prevent Northgate from exercising its rights under the instrument to landscape the easement area and to bury utilities beneath the road.

In this regard, the trial court stated: "Northgate presented testimony that it would like to landscape the easement, add pedestrian walkways and convert the southwestern road into a grand thoroughfare. None of this testimony was credible. Northgate used the easement for nearly 20 years as a secondary access road and did nothing to improve it --

---

[3]     Bromiley's testimony showed that at the time he built the 80-unit Northgate apartment complex, he had no intent to further develop the property because it was only zoned for 80 units.

Northgate didn't even resurface or maintain the pavement. Northgate's 'vision' to transform the southwestern road was announced after IMT made its improvements; Northgate's conceptual plans don't even mention the southwestern road . . . and its application to the city was not made until November 2011, after IMT had opened for business . . . . Northgate's grand plans for landscaping and improving the easement area are entirely unbelievable and appear to be nothing more than litigation posturing. [¶] Moreover, Northgate's purported plans to transform the southwestern road into the principal entrance for the Northgate Property are beyond the scope of the easement and would impose an impermissible burden upon the IMT Property."

The trial court also rejected as "not credible" Northgate's testimony that it would like to run utility lines beneath the southwestern road. "The utility lines for the existing 80 units of the Northgate Property run in a northeastern direction from the existing apartment buildings to Blucher Avenue . . . . Northgate's witnesses testified that the existing utility lines are more than capable of handling utilities for the proposed 28 unit development . . . , the [DWP] engineer Anthony Ramirez testified that the existing electric utility lines can easily be used for the new development, there was no evidence that the existing utility lines are outdated or inadequate, and there was no persuasive evidence to explain why Northgate would like to run utilities over a longer and more expensive route. Like Northgate's landscaping plans, this argument is not credible and appears to be litigation posturing. [¶] In any case, there was no proof that Northgate would be unable to install utilities beneath the southwestern road if it really chose to do so. IMT has provided Northgate with 'as built' plans which show the location of the IMT utility lines . . . , USA Locators or Dig Alert can determine the precise location of IMT's utilities, IMT has offered to cooperate in locating utilities . . . , and there appears to be more than adequate space underneath the road for additional utility lines."

(4) *Trial court's determination that IMT is entitled to equitable relief.*

The trial court concluded IMT was entitled to a quiet title decree and declaratory judgment, stating that the easement recorded on July 1, 1985 does not grant Northgate

14

exclusive rights in relation to IMT, that IMT has the right to use the easement area to access the IMT Property, and that IMT's existing improvements in and around the easement area do not violate the terms of the easement or Northgate's rights thereunder. IMT also was entitled to a permanent injunction barring Northgate from taking any action that would prevent IMT from using the easement area to access the IMT Property or that would require IMT to remove or modify its existing improvements in and around the easement area. The trial court denied IMT injunctive relief to the extent that IMT sought a permanent injunction prohibiting Northgate from installing utilities or landscaping within the easement area, stating "IMT and Northgate both have rights in this area, and they will simply have to cooperate."[4]

The trial court rejected Northgate's defenses to IMT's claims for equitable relief, finding Northgate "has not established unclean hands, bad faith or similar misconduct. The evidence has shown that IMT acted reasonably and in a good faith manner throughout the events in this action, and the equities overwhelmingly favor IMT. [¶] IMT acquired its property on September 30, 2010, and before closing escrow IMT received a preliminary title report, reviewed the easement, consulted with counsel, and concluded that the easement did not restrict its rights to improve the IMT Property or the easement area. IMT's interpretation of the easement was reasonable and largely consistent with the conclusions reached by the Court."

Further, "IMT acted in a reasonable and cooperative manner toward Northgate. Even before escrow closed, IMT's regional manager paid a courtesy visit to Northgate's resident manager during which IMT's plans to install gates were discussed. After escrow closed, IMT's managers met with Neil Shekhter and his top manager at Northgate. During this meeting, Jeremy Byk specifically mentioned to Shekhter that IMT planned to use the southwestern road for access to the IMT Property and would re-pave and improve the road and install access gates. Consistent with Northgate's approach toward IMT's

---

4       When an easement is nonexclusive, the common users have to accommodate each other. (*Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 703 (*Scruby*).)

predecessors, Shekhter did not register any objections. Shekhter made only one request about the southwestern road: that IMT clean up some debris left by the preceding owner, and IMT promptly complied. While Shekhter denied this conversation, his testimony is not credible and Byk's testimony about the conversation is credible and persuasive." The trial court concluded the "balance of equities overwhelmingly favors IMT, and this provides an additional ground for ruling in its favor."

c. *Entry of judgment and the first appeal.*

On August 22, 2013, consistent with its statement of decision, the trial court entered judgment on the complaint in favor of IMT and ordered that Northgate and NMS take nothing on their cross-complaint.

On October 21, 2013, following the denial of their motion for new trial, Northgate and NMS filed a timely notice of appeal from the judgment.

d. *Postjudgment award of attorney fees and the second appeal.*

On October 23, 2013, IMT, as the prevailing party, filed a motion seeking an award of $1,824,282.98 in attorney fees based on 4,070.55 hours of professional time, pursuant to the attorney fees provision in the grant of easement.

Northgate opposed the motion, contending the amount sought was excessive and that the trial court should either deny the request in its entirety or at a minimum make a substantial reduction.

On February 24, 2014, the trial court awarded IMT attorney fees of $1,185,783, amounting to a reduction of 35 percent. The trial court based the reduction on "substantial duplication by those who worked on the case," but concluded "$1,185,783 is a reasonable amount based upon all the circumstances of the case."

On April 16, 2014, Northgate and NMS filed a timely notice of appeal from the attorney fee order. The two appeals later were consolidated.

## CONTENTIONS

Northgate contends: in granting declaratory relief in IMT's favor, the trial court misapplied applicable legal principles and misconstrued the grant to permit IMT to use

16

the easement area for the permitted uses and to place improvements in the easement area; the trial court erred in finding that IMT did not wrongfully interfere with Northgate's rights or breach its obligations under the grant by constructing permanent structures and systems in the easement area; the trial court erred in attempting to balance the equities; and the trial court abused its discretion in awarding IMT $1,185,783 in attorney fees.

## DISCUSSION

1. *Standard of appellate review.*

The threshold question is whether the grant of easement is ambiguous -- that is, reasonably susceptible to more than one interpretation. (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 389.) The question of the existence of an ambiguity is a question of law subject to independent review on appeal. (*Ibid.*) Therefore, we address de novo whether the instrument is ambiguous with respect to whether Northgate has an exclusive easement and whether IMT is prohibited from making improvements to the easement area.

If an instrument is ambiguous with respect to the scope of an easement grant, insofar as the trial court relies on extrinsic evidence to resolve any ambiguities, where the trial court's " 'construction appears to be consistent with the true intent of the parties an appellate court will not substitute another although it may seem equally tenable.' [Citation.]" (*Scruby*, *supra*, 37 Cal.App.4th at pp. 705-706.)

2. *General principles re interpretation of easements.*

An easement is a "restricted right to specific, limited, definable use or activity upon another's property, which right must be *less* than the right of ownership." (*Mesnick v. Caton* (1986) 183 Cal.App.3d 1248, 1261.) The "extent of a servitude is determined by the terms of the grant, . . . by which it was acquired." (Civ. Code, § 806.)

Insofar as "construction of the grant of the right of way is concerned[,] section 1069 of the Civil Code declares that 'A grant is to be interpreted in favor of the grantee, except that a reservation in any grant . . . is to be interpreted in favor of the grantor.' " (*Laux v. Freed* (1960) 53 Cal.2d 512, 522; accord *City of Manhattan Beach v. Superior*

17

*Court* (1996) 13 Cal.4th 232, 242-243 [" 'doubtful clauses in the deed are to be construed most strongly against the grantor, and as favorably to the grantee as the language, construed in the light of the surrounding facts, will justify' "].) In construing an instrument conveying an easement, the rules applicable to the construction of deeds generally apply. (*Laux v. Freed*, *supra*, at pp. 522-523; *Scruby*, *supra*, 37 Cal.App.4th at p. 702.)

"One of such rules is that if the language of a deed is plain, certain and unambiguous, neither parol evidence nor surrounding facts and circumstances will be considered to add to, detract from, or vary its terms or to determine the estate conveyed." (*Laux v. Freed*, *supra*, 53 Cal.2d at p. 523; accord *Scruby*, *supra*, 37 Cal.App.4th at p. 702.) On the other hand, if the language is ambiguous and uncertain, extrinsic evidence is admissible as an aid to interpretation, "unless such evidence imparts a meaning to which the instrument is not reasonably susceptible." (*Buehler*, *supra*, 17 Cal.3d at p. 526; accord, *Scruby*, *supra*, at p. 702.)

When the extent of an "express easement[] . . . is in question" (*Camp Meeker Water System, Inc. v. Public Utilities Com.* (1990) 51 Ca1.3d 845, 867 (*Meeker*)), the extent of the easement " ' "is to be inferred from the circumstances which exist at the time of the conveyance . . . . Among these circumstances is the use which is being made of the dominant tenement at that time. Yet it does not follow that the use authorized is to be limited to such use as was required by the dominant tenement at that time. It is to be measured rather by such uses as the parties might reasonably have expected from the future uses of the dominant tenement. What the parties might reasonably have expected is to be ascertained from the circumstances existing at the time of the conveyance. It is to be assumed that they anticipated such uses as might reasonably be required by a normal development of the dominant tenement . . . ." (Rest., Property,§ 484, comment b.) [¶] Accordingly, in determining the intent of the parties as to the extent of the grantee's rights . . . consideration must be given not only to the actual uses being made at the time of the severance, but also to such uses as the facts and circumstances show were within

18

the reasonable contemplation of the parties at the time of the conveyance.' " (*Meeker*, *supra*, 51 Cal.3d at pp. 866-867.)

3. *The instrument granting the easement is ambiguous*.

On our de novo review, we conclude the instrument granting Northgate an express easement contains two significant ambiguities.

The instrument purported to grant the Northgate Property an "exclusive" easement. However, the instrument also stated that the IMT Property "shall not make any use of the Easement Area which interferes with or is incompatible with the full and free exercise of the Easement rights and rights of way of Grantee created hereby." Thus, the instrument expressly contemplated that the IMT Property would continue making *some use* of the easement area. Such continued use of the easement area by IMT would be inconsistent with an exclusive easement in favor of Northgate.

The instrument is also ambiguous with respect to IMT's right to improve the easement area. In one section it states that the grantor (IMT) "covenants and agrees that no buildings, structures, or improvements of any kind shall be placed, erected or maintained on any part or portion thereof." However, the instrument then goes on to state: "Each of the parties hereto agrees to and it shall pay and bear the cost and expense of any and all improvements to all or any portion of the Easement Area made by such party hereunder, and further, such party shall pay the full cost and expenses of maintenance and repair of any such improvements made by it." This latter requirement that each party bear its own cost in improving the easement area, and thereafter in maintaining and repairing such improvements, is at odds with a prohibition on IMT making any improvements to the easement area.

In view of the ambiguous language of the grant of easement, the trial court properly received extrinsic evidence to determine the correct interpretation of the grant.

19

4. *Trial court properly construed the instrument as granting a nonexclusive easement to Northgate, retaining in IMT the right to use and improve the easement area, provided that IMT does not unreasonably interfere with Northgate's use and enjoyment thereof.*

Our review of the trial court's interpretation of the easement grant is governed by the settled rule that where extrinsic evidence properly has been admitted as an aid to the interpretation of an instrument and the evidence is in conflict, a reasonable construction by the trial court will be upheld under the general rule of conflicting evidence. (*Parsons v. Bristol Development Co*. (1965) 62 Cal.2d 861, 865-866; *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747; see generally, 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 381, p. 438.) Accordingly, a reasonable construction of the easement by the trial court, if supported by substantial evidence, must be upheld.

Bromiley testified, inter alia, that his intent in creating the easement was to provide a secondary access road for the Northgate Property, so as to permit access by emergency vehicles and to provide a second way in and out, other than via Blucher Avenue. The trial court credited this portion of Bromiley's testimony, stating it was "entirely consistent with the language of the easement and with the subsequent conduct of the parties."

Further, consistent with the general rule of contract construction that the parties' practical construction of a contract, as shown by their actions, is important evidence of their intent (*Kalmanovitz v. Bitting* ( 1996) 43 Cal.App.4th 311, 316), the "practical construction" placed upon an agreement conveying an easement will be held to fix the limits of the easement under the agreement. (*San Joaquin & Kings etc. Co. v. Egenhoff* (1943) 61 Cal.App.2d 82, 86; see generally, 6 Miller & Starr, Cal. Real Estate (4th ed. 2015) § 15:56.)

With respect to the conduct of the parties in the years since the easement's creation in 1985, the trial court specifically credited the testimony of Northgate's resident property manager, who resided at the Northgate Property from 1989 to the time of trial,

under the ownership of both Bromiley and Shekhter. According to Alba, "during this entire period the southwestern road was rarely used. It was paved but had cracks and protruding roots that made passage difficult. A gate was installed at the north end of the road, but it was not automated or self-opening and it was frequently padlocked to enhance security at the Northgate Property."

Thus, the trial court properly concluded "[t]he conduct of the parties shows very clearly that the easement was intended to provide the Northgate Property with a limited, secondary access road through the IMT Property. It was never intended to provide the broad and exclusive rights that Northgate has claimed." Accordingly, the trial court properly construed Northgate's easement as being nonexclusive in nature, preserving in IMT the right to use and improve the easement area, *provided that* IMT does not unreasonably interfere with Northgate's use and enjoyment thereof.

5. *Trial court properly found IMT's improvements did not unreasonably interfere with Northgate's use and enjoyment of the easement.*

Northgate's theory is that because its easement is *exclusive*, IMT is prohibited from constructing *any* improvements in the easement area. However, as already discussed, Northgate's easement is not exclusive, entitling IMT to reasonable use of the easement area. Therefore, the issue is whether IMT's improvements unreasonably interfered with Northgate's rights.

The owner of the servient tenement, i.e., the land which is burdened with the easement, may make continued use of the area the easement covers so long as the use does not interfere unreasonably with the easement's purpose (*Meeker*, *supra*, 51 Cal.3d at p. 867), and whether a particular use by the servient owner of land subject to an easement is an unreasonable interference with the rights of the dominant owner is a question of fact for the trier of fact. (*Scruby*, *supra*, 37 Cal.App.4th at p. 703.) Accordingly, the trial court's finding that IMT's use of the easement area did not unreasonably interfere with Northgate's right of ingress and egress, if supported by substantial evidence, is binding on appeal. (*Ibid.*)

21

As set forth in our summary of the statement of decision, the trial court made extensive findings rejecting Northgate's claim that IMT's improvements unreasonably interfered with Northgate's easement rights. The trial court found that IMT's improvements did not interfere with Northgate's ingress and egress; to the contrary, the roadway is now smoothly paved and much more functional than before. Although the roadway had been narrowed to 28 feet, this complies with fire department requirements and enables all manner of vehicles to pass up and down the road. Also, other encroachments such as an electrical transformer, guard rail and retaining wall, a backflow valve and mailboxes, are "entirely minor and insubstantial." IMT's security gates have enhanced security for both properties, and IMT has provided access codes and remote control devices to Northgate to enable vehicular and pedestrian access by Northgate's residents. Thus, the southwestern road now is actually *more* accessible than previously, when Northgate had the road closed off and the gate padlocked. Further, IMT's improvements do not preclude Northgate from adding another 28 units to the Northgate Property or from burying additional utility lines in the easement area.

Northgate does not challenge the sufficiency of the evidence to support these factual findings, which provide ample support for the trial court's determination that IMT's improvements did not unreasonably interfere with Northgate's use and enjoyment of the easement.

6. *No merit to Northgate's argument the trial court erred in balancing the equities in favor of IMT.*

By way of background, a court "has discretion to balance the hardships and deny removal of an encroachment if it was innocently made and does not irreparably injure the plaintiff, and where the cost of removal would greatly exceed the inconvenience to the plaintiff by its continuance. [Citations.]" (*Warsaw v. Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 575-576, original italics deleted.)

Here, in ruling on the matter, the trial court found the "balance of equities overwhelmingly favors IMT, and this provides an additional ground for ruling in its

22

favor." The trial court found, inter alia, IMT acted in a reasonable and cooperative manner toward Northgate, and that Northgate did not assert any objections to IMT's improvements until October 2011, *after* IMT had completed its work in the easement area. Although Northgate disagrees with the trial court's conclusions, Northgate has not shown these findings with respect to the relative equities are unsupported by substantial evidence in the record.

Moreover, as discussed above, IMT is not precluded by the easement grant from making reasonable use of the easement area, including constructing improvements therein -- provided that IMT does not unreasonably interfere with Northgate's use and enjoyment of the easement area. Therefore, we reject Northgate's contentions that the trial court should have required IMT to remove its improvements, to cease using the easement area, and to pay damages to Northgate.

In sum, Northgate has not shown the trial court erred in its balancing of the equities.

7. *No showing of abuse of discretion in amount of attorney fees awarded to IMT*.

IMT's post-trial motion for attorney fees sought $1,824,282. In ruling on IMT's fee request, the trial court disallowed 35 percent thereof, for a net fee award of $1,185,783. Northgate contends that even after the $638,499 reduction, the fee award was excessive and constituted an abuse of discretion. The argument is unavailing.

a. *Standards governing trial court's award of attorney fees*.

The first step in fee setting is determining the lodestar amount, that is, "the number of hours reasonably expended multiplied by the reasonable hourly rate. . . . The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM*).) The factors the trial court may consider include the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, the attorney's learning, age and experience in the

23

particular type of work demanded, the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed.  (*Id*. at p. 1096; *Martino v. Denevi* (1986) 182 Cal.App.3d 553, 558.)

In determining the lodestar figure, the trial court need not specify which fees or hours it is allowing or disallowing.  " 'In California, the trial court has no sua sponte duty to make specific factual findings explaining its calculation of the fee award and the appellate courts will infer all findings exist to support the trial court's determination.' " (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1250.)  The trial court is not required to identify each item it found to be unsupported or unreasonable because " ' "[w]e do not want 'a [trial] court, in setting an attorney's fee, [to] become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It . . . is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps dwarfing the case in chief.' " ' " (*PLCM*, *supra*, 22 Cal.4th at p. 1098.)

b.  *Trial court's ruling*.

In ruling on the fee request, the trial court set forth its rationale as follows:

"The determination of what constitutes a reasonable attorney fee begins with the 'lodestar,' the number of hours reasonably expended multiplied by a reasonable hourly rate.  The lodestar is the basic fee for comparable legal services in the community, and it may be adjusted up or down by the court based on the unique circumstances of the case. [Citations.]  [¶]  IMT requests attorney fees in the total amount of $1,824,282.98.  This is based upon 4,042.55 hours, apportioned as follows:  980.5 hours for a total fee of $395,431 for Lewis Roca Rothgerber LLP (LRR); 2,386.15 hours for a total fee of $1,264,516.48 for Hughes Hubbard & Reed LLP (HHR); 675.9 hours for a total fee of $149,935.50 for Levinson Arshonsky & Kurtz LLP (LAK); and 28 hours for a fee of $14,400 in replying to Northgate's opposition and attending the hearing on this motion.

"Northgate has argued that IMT's total attorney fees are unreasonably inflated, and it requests a complete denial of fees pursuant to *Serrano v. Unruh* (1982) 32 Cal.3d

24

621 and *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970. That request is denied. The court will instead examine the components of IMT's fee request and determine a reasonable overall fee.

"IMT's effective hourly rates range from $222.62 to $799 for partners, $215 to $629.70 for associates, and $162.04 to $232.16 for paralegals. Northgate objects to the rates charged by HHR and LRR, but not LAK. The court finds . . . that all of IMT's hourly rates are reasonable. While the rates charged by HHR are high, they are within the range of comparable law firms in the Los Angeles area.

"IMT's total number of hours is 4,070 (including time on this motion), divided between three law firms. The greatest number of hours were at HHR (2,386), followed by LRR (980) and LAK (675). Northgate objects to these hours as inflated and unreasonable; Northgate points to multiple IMT attorneys appearing at depositions, hearings and trial. IMT contends that the use of multiple law firms was justified, based on the different phases of the litigation, IMT's long-time use of LRR in real estate matters, and LAK's role in defending certain claims made in Northgate's cross-complaint. Partners from each of IMT's law firms state that they made diligent efforts to minimize duplication and maximize efficiency.

"The court has considered all of the parties' arguments and has carefully reviewed the billing statements and other evidence submitted. The court will award IMT a total of $1,185,783 in attorney fees. [¶] The court's award is based upon the lodestar, billing rates and hours claimed by IMT, which are supported by its papers. The lodestar is reduced by 35 percent, for the following reasons:

"The award has been reduced because of the substantial duplication by those who worked on the case. There were 23 individuals who worked on the trial court proceedings: 7 partners, 11 associates, 4 paralegals, and l summer associate. These individuals were employed at three separate law firms: two in Los Angeles and one in Phoenix. This complex structure necessarily resulted in duplication and inefficiency.

25

"The court recognizes that this case involved complex issues and was aggressively litigated by Northgate. A sizeable fee award is a necessary product of those factors. But dividing the case among three separate law firms and a sizeable number of individuals at each firm produced an excessive total fee. The duplication of services is apparent from IMT's billing statements, and it was obvious during the proceedings before the court. A significant downward adjustment is entirely appropriate.

"In applying these factors, the court has made a gross reduction of 35 percent in the lodestar claimed by IMT. The court considered making a more precise adjustment by deducting services from the lodestar itself, but this simply was not feasible. A gross reduction was appropriate under the circumstances, and the overall fee award of $1,185,783 is a reasonable amount based upon all the circumstances of the case."

c. *Standard of appellate review*.

In the trial court, "the burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable." (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 98 (*Gorman*).) On appeal, however, we presume the judgment is correct and the appellant must establish prejudicial error. (*Id.* at p. 67.)

"In particular, '[w]ith respect to the amount of fees awarded, there is no question our review must be highly deferential to the views of the trial court.' ([Citation]; see *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [recognizing trial court's broad discretion in determining amount of reasonable attorney fees because experienced trial judge is in the best position to decide value of professional services rendered in court]; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 [same].) 'An appellate court will interfere with the trial court's determination of the amount of reasonable attorney fees only where there has been a manifest abuse of discretion.' [Citations.]" (*Concepcion v. Amscan Holdings, Inc.* (2014 ) 223 Cal.App.4th 1309, 1319-1320, italics omitted.)

26

d. *No showing the trial court abused its discretion in reducing fees by 35 percent rather than by a greater percentage.*

Northgate contends the amount of fees awarded to IMT was an abuse of discretion because, among other things, IMT's legal team was overstaffed, there was duplication of efforts, the billing records were deficient, the hourly rates were excessive, and the moving papers precluded the trial court from employing a true lodestar analysis.

However, in its order awarding attorney fees, the trial court addressed the concerns raised in Northgate's opposition to the motion. It imposed a sizable reduction of 35 percent based on its finding of "substantial duplication" which "necessarily resulted in duplication and inefficiency." The trial court made the reduction it believed necessary to arrive at reasonable attorney fees for the work performed over the course of the litigation. At this juncture, the burden lies with the appellant to demonstrate that the trial court abused its discretion in its award of attorney fees. (*Gorman*, *supra*, 178 Cal.App.4th at p. 98.) Northgate reiterates the arguments that it made below, complaining that the amount awarded to IMT was excessive. However, this court's role is not to determine the amount of fees that should have been awarded below, but rather, to review the exercise of discretion by the trial court. We conclude Northgate has failed to show that the trial court abused its discretion in reducing IMT's fees by only 35 percent instead of imposing a greater reduction.[5]

---

[5] The closing sentence of the Argument section in the appellants' opening brief states "the Trial Court erred by not factoring in that NMS was not a party to the grant and, therefore, was not subject to the attorney's fees provision." This one-sentence contention, unsupported by any citation to the record or to any legal authority, requires no discussion and is forfeited. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 (*Mansell*).) We note the trial court specifically ruled that apportionment of attorney fees was *not* required as between Northgate and NMS, citing *Loduca v. Polyzos* (2007) 153 Cal.App.4th 334, 343, and *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111.) NMS has not developed an argument as to why the trial court erred in this regard. It is settled that it is "not this court's function to serve as . . . backup appellate counsel" (*Mansell*, *supra*, at p. 546) and to construct an argument on an appellant's behalf.

## DISPOSITION

The judgment and postjudgment order are affirmed. IMT shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



ALDRICH, J.                                          JONES, J.[*]

_____

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28